UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

ERIC ANDREW FUTRAL                    CIVIL ACTION NO. 6:21-cv-00886

VERSUS                                JUDGE JUNEAU

COMMISSIONER OF THE SOCIAL            MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, and for the reasons set forth below, it is recommended that the Commissioner's

decision should be affirmed.

## Administrative Proceedings

The claimant, Eric Andrew Futral, fully exhausted his administrative remedies

before initiating this action.  He filed applications for disability insurance benefits

and supplemental security income benefits, alleging disability beginning on June 15,

2014.[1]  His applications were denied.[2]  He then requested a hearing, which was held

on June 16, 2020 before Administrative Law Judge Luke Liter.[3]  The ALJ issued a

---

[1]      Rec. Doc. 5-1 at 227, 229.

[2]      Rec. Doc. 5-1 at 92, 94.

[3]      A transcript of the hearing is found in the record at Rec. Doc. 5-1 at 68-91.

decision, concluding that Mr. Futral was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date of the decision.[4]  Mr. Futral asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review.[6]  Mr. Futral then filed this lawsuit, seeking judicial review of the Commissioner's decision.

## <u>Summary of Pertinent Facts</u>

Mr. Futral was born on November 10, 1980[7] and was 39 years old at the time of the ALJ's decision.  He graduated from high school[8] and previously worked as a waiter, bartender, and assistant food and beverage director at a hotel.[9]  He contends that he has been disabled since June 15, 2014[10] due to low vision, a back injury at L4-L5, rheumatoid arthritis, depression, and high blood pressure.[11]

---

[4]    Rec. Doc. 5-1 at 24-38.

[5]    Rec. Doc. 5-1 at 5.

[6]    *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]    Rec. Doc. 5-1 at 76, 96.

[8]    Rec. Doc. 5-1 at 259.

[9]    Rec. Doc. 5-1 at 77-79.

[10]    Rec. Doc. 5-1 at 229.

[11]    Rec. Doc. 5-1 at 97, 259.

Mr. Futral treated with Drs. Richard J. Bidstrup and John Allgood at the Ear, Nose, Throat & Allergy Clinic of Opelousas, Louisiana, in 2016 and 2017.[12]  But there is no allegation that the conditions for which Mr. Futral's saw these doctors were disabling, either solely or in combination with other claimed conditions.

Mr. Futral treated with Dr. Robert I. Blem of the Louisiana Retina Center from January to April 2018.[13]  At the hearing, however, Mr. Futral testified that his eye problems had resolved.

On May 6, 2016, Mr. Futral was examined by Dr. John Rhodes at the request of the state disability office.[14]  He gave a history of "an L4-L5 meniscal tear that was associated with lower back pain with radiation down the left knee," which allegedly resulted from a fall down ten steps in 2014.  He said that he had received three epidural steroid injections with little benefit.  He also claimed to have degenerative disk disease of the lumbar spine, scoliosis, and cervical spine issues including disc bulges at C5-C6 and C6-C7.  He claimed to have macular edema that was treated with steroid injections, predisposing him to cataracts, but he denied any vision complaints.  He also claimed to have seasonal allergies, insomnia, and anxiety.  He

---

[12]     Rec. Doc. 5-1 at 323-343.

[13]     Rec. Doc. 5-1 at 346-355.

[14]     Rec. Doc. 5-1 at 361-368.

reported that he was taking Gabapentin, Tramadol, Alprazolam, Meloxicam, Metoprolol, Benazepril, Pravastatin, Montelukast, Methocarbamol, and Vitamin D3.

Mr. Futral reported that he was able to dress and feed himself and could walk a block on level ground. But he also reported difficulty with standing for five to fifteen minutes and lifting more than five to ten pounds with either arm. He stated that he was unable to sweep, mop, or vacuum, do dishes, or cook for more than five to fifteen minutes. He reported that he was unable to do yard work and could climb no more than two to three steps. He denied having been hospitalized for mental issues, denied any suicide attempts, and denied taking any medication for mental issues. He denied having been hospitalized or having had an emergency room visit in the previous two years, and he denied having had major surgery. He reported a history of anxiety syndrome but no depression, panic attacks, or bipolar disorder.

Dr. Rhodes noted that Mr. Futral was able to get up and out of a chair and onto and off the examination table without difficulty. His gait was normal, and he walked without an assistive device. Upon examination, Dr. Rhodes noted that there was evidence of spinal scoliosis but no spasm of the paraspinous muscles and no evidence of kyphosis. Sitting and supine straight leg raise tests were positive in the left leg but negative in the right leg. Mr. Futral was able to walk on his heels but not on his toes, he could squat, he could perform tandem heel walking, and he could

bend over and touch his toes.  His range of motion was normal in all joints, and no joint deformities were noted.

Dr. Rhodes stated that objective findings on examination and on MRI showed a torn disc in Mr. Futral's spine, which contributed to chronic pain.  He stated that this along with his cervical spine injuries were "ongoing" and "likely contribute to some degree of functional impairment."  He found no other conditions causing functional impairment.  In Dr. Rhodes's opinion, Mr. Futral was able to stand and sit only occasionally or for very little up to 1/3 of an eight-hour workday.

Mr. Futral's primary care physician was Dr. Eric M. Chatman.  Mr. Futral saw Dr. Chatman several times between February 2017 and November 2019.  On April 3, 2017,[15] Mr. Futral complained to Dr. Chatman about left leg pain.  He was diagnosed with pure hyperglyceridemia, essential hypertension, mixed hyperlipidemia, chronic sinusitis, and allergic rhinitis.  But there was no diagnosis related to Mr. Futral's leg pain or his allegedly disabling back and neck problems.

When Mr. Futral saw Dr. Chatman on June 6, 2017, he reported that Gabapentin was helping to relieve his pain.  Dr. Chatman's assessments were essential hypertension; radiculopathy, lumbar region; unspecified anxiety disorder; and other intervertebral disc degeneration, thoracolumbar region.

---

[15]     Rec. Doc. 5-1 at 394-395.

On July 11, 2017,[16] Mr. Futral reported to Dr. Chatman that he had been having a lot of pain recently in his low back and hip area. He reported that he had been taking Gabapentin without relief but was also taking Tramadol. He reported that taking Gabapentin and Tramadol together was helpful. However, he asked for a Norco prescription. He also reported a shooting pain in the palm of his right hand into his wrist.

Mr. Futral followed up with Dr. Chatman again on September 28, 2017.[17] He reported that he had some discomfort in his left leg but was controlling it with medication. The diagnoses were essential hypertension; pure hyperglyceridemia; mixed hyperlipidemia; unspecified tachycardia; and radiculopathy, lumbrosacral region. He was prescribed medication for a rash on his hand and he was taking Chantix to stop smoking.

The only complaint documented on Dr. Chatman's treatment note from December 19, 2017 was that Mr. Futral's vision was getting worse.[18]

On February 28, 2017,[19] Mr. Futral reported to Dr. Chatman that he was having low back pain, left hip pain, and left leg pain. He was taking medication for

---

[16]    Rec. Doc. 5-1 at 391.

[17]    Rec. Doc. 5-1 at 389-390.

[18]    Rec. Doc. 5-1 at 387-388.

[19]    Rec. Doc. 5-1 at 386.

6

his pain, and his medications were refilled.  However, the diagnoses assigned by Dr. Chatman that day had nothing to do with Mr. Futral's pain complaints.  The diagnoses were pure hyperglyceridemia; unspecified hyperglycemia; family history of diabetes mellitus; unspecified hyperlipidemia; and unspecified iridocyclitis (an eye condition).

When Mr. Futral saw Dr. Chatman again on May 29, 2018,[20] he stated that he was having right wrist pain and numbness in his pinky and ring finger.  Phalen's sign was positive in his ulnar area.  He was wearing a brace at night and was taking his prescribed pain medications.  Dr. Chatman suspected right ulnar neuropathy. Vascepa, which is used to reduce the risk of heart attack,[21] was added to his medications.

Mr. Futral saw Dr. Chatman again on November 7, 2018.[22]  He reported feeling depressed for the past couple of months and continued left leg pain.  He said he was taking his medications as prescribed.  The treatment note indicates that he was following up with regard to hyperlipidemia, anxiety, chronic sinusitis, degenerative spine disease with radiculopathy and sciatica, and hypertension.  He reported left trapezius pain that was better but had been recurring for two to three

---

[20]    Rec. Doc. 5-1 at 384-385.

[21]    Vascepa, https://www.vascepa.com (last visited Nov. 23, 2021).

[22]    Rec. Doc. 5-1 at 448.

years.  Dr. Chatman's diagnoses were adjustment disorder with mixed anxiety and depressed mood, essential hypertension, and mixed hyperlipidemia.  Medication was prescribed for Mr. Futral's mood.

On April 16, 2019, Mr. Futral again saw Dr. Chatman, but there is no mention of any pain complaints or medications.[23]

On May 29, 2019, Mr. Futral complained to Dr. Chatman of constant left leg pain but also stated that "overall he has been doing ok."[24]

When Mr. Futral saw Dr. Chatman again on July 19, 2018,[25] weight loss and vision problems were discussed.  There is no mention in the treatment notes of neck pain, back pain, or leg pain.  It was noted that Mr. Futral was "doing ok."

On September 8, 2018, Mr. Futral was examined by Dr. Andriette Fitch at the request of the state disability office.[26]  Mr. Futral gave a history of having treated with Dr. Chatman as his primary care physician and with Dr. Blem, an eye specialist. He explained that he had been diagnosed with toxoplasmosis of the eyes six years earlier, was treated with ocular steroids, and had early stage cataracts.  He stated that he took medication for hypertension.  He also stated that he had pain due to a disc

---

[23]      Rec. Doc. 5-1 at 445.

[24]      Rec. Doc. 5-1 at 444.

[25]      Rec. Doc. 5-1 at 442-443.

[26]      Rec. Doc. 5-1 at 424-432.

herniation at L4-L5 and had undergone lumbar injections a year earlier. He stated that he was diagnosed with arthritis but was not sure if it was rheumatoid or osteo arthritis. He described his low back pain as sharp, stabbing, and constant; worse with standing, sitting, and walking; better with rest; and radiating down his left leg. He rated that pain at five out of ten. Mr. Futral told Dr. Fitch that he was diagnosed with depression in 1999, but was never hospitalized for mental issues and was not currently taking any medication for mental issues or seeing a psychiatrist. He stated that he was taking Gabapentin, Tramadol, Benazepril, Methocarbamol, Fenofibrate, Metoprolol, Montelukast, Cetirizine, Pravastatin, and Alprazolam.

Mr. Futral denied needing an ambulatory device. He stated that he could walk very short distances on level ground. He denied difficulty in feeding and dressing himself. He estimated that he could stand for only about five minutes, could drive a car for no more than five to fifteen minutes, could lift no more than ten to twenty-five pounds with either arm, and could cook for only about five to fifteen minutes. He stated that he could not sweep, mop, or vacuum, do yard work, or climb more than one flight of stairs.

Dr. Fitch noted that Mr. Futral was able to get up and out of a chair and on and off the examination table without difficulty. His gait was normal. There was no evidence of scoliosis, no spasm of the paraspinous muscles, and no evidence of kyphosis. He was able to walk on his toes and heels, he could squat and recover, he

could perform tandem heel walking. His ability to bend over and touch his toes was limited by subjective pain. Sitting and supine straight leg raise tests were positive in both legs. His range of motion was limited in his cervical and lumbar spine. X-rays showed disc space narrowing at L2-L3 and L4-L5 as well as lumbar spondylosis.

Dr. Fitch's impressions were low vision due to cataracts, back injury at L4-L5, rheumatoid arthritis, depression, and high blood pressure. She stated that, based on the medical history and objective clinical findings, "this claimant has limitations." She then stated that Mr. Futral had limitations in standing and walking, but was able to walk and stand continuously in an eight-hour work day or more than 2/3 of the day. She also stated that he had a limited ability to bend or stoop but ambulated without difficulty and without assistive devices.

When he saw Dr. Chatman on August 5, 2019,[27] Mr. Futral again reported that he was "doing ok." The purpose of the visit was to follow up with regard to hyperlipidemia, anxiety, chronic sinusitis, degenerative spine disease with radiculopathy and sciatica, and hypertension. Because he had been having recurring episodic diarrhea along with a family history of Crohn's disease, he was referred to Dr. Boagni. The diagnoses were essential hypertension, pure hyperglyceridemia,

---

[27]    Rec. Doc. 5-1 at 440-441.

mixed hyperlipidemia, unspecified anxiety disorder, and pure hypercholesterolemia. The treatment note indicates that he was still taking Tramadol.

Mr. Futral saw gastroenterologist Dr. C. Scott Boagni on August 28, 2019.[28] There is no mention in the treatment note of Mr. Futral's degenerative disc disease or pain complaints other than the fact that he was taking Tramadol, Gabapentin, and Methocarbamol.

On October 7, 2019, Mr. Futral returned to Dr. Chatman.[29]  Again, he was "doing ok."  It was noted that he was there to follow up concerning hyperlipidemia, anxiety, chronic sinusitis, degenerative spine disease with radiculopathy and sciatica, and hypertension.  The diagnoses assigned were essential hypertension, pure hypercholesterolemia, mixed hyperlipidemia, and proteinuria.  It was noted that he was also treating with Dr. Casanova, but there is no documentation from that doctor in the record.  His medications were refilled.

On July 24, 2020, Dr. Chatman filled out an "arthritis medical source statement" for Mr. Futral.[30]  On the form, he stated that Mr. Futral had degenerative thoracic, lumbar, and lumbrosacral disc disease with radicular pain, degenerative cervical discs, and scoliosis.  He described Mr. Futral's symptoms as neck, mid back,

---

[28]     Rec. Doc. 5-1 at 481.

[29]     Rec. Doc. 5-1 at 438-439.

[30]     Rec. Doc. 5-1 at 483-486.

and low back pain (worse on the left side); sedation and fatigue due to medications; left leg burning, tingling, and numbness; and sharp left heel pain. He reported that Mr. Futral's pain worsened with activity including minimal housework and also with prolonged standing, sitting, or lying on one side (particularly the left side). He stated that Mr. Futral's heel pain worsened with any touch. He stated that Mr. Futral experienced pain three to four days per week, and stated that the pain was severe, up to ten out of ten. Dr. Chatman also stated that Mr. Futral experienced anxiety and a depressed mood, especially with pain flare ups. In the report, Dr. Chatman also expressed many more specific opinions concerning Mr. Futral's functionality.

On June 16, 2020, Mr. Futral testified at a hearing regarding his symptoms and his medical treatment. He stated that he stopped working in 2014 because back and leg pain prevented him from continuing to work on a consistent basis. He stated that if he worked one day, he would not be able to move the next day. He stated that he had consulted a neurologist who recommended against surgery, opining that surgery would worsen his condition. He testified that the problems with his eyes had resolved, as the toxoplasmosis infection in his eyes was under control and he had recently had cataract surgery. He stated that he could not sit up to drive and reported that the medication he takes "doesn't really mix well with driving." Mr. Futral testified that he could walk for no more than twenty minutes at a time. He said that walking longer would either cause his left leg to go numb or he would

experience shooting pains in his left leg as well as stumbling and tripping with his left leg. He stated that sitting for an extended period caused the same problems in his left leg. He stated that he fell often. He further explained that sitting in a reclined position was best, but when the pain was really bad he had to lie down on his right side. Mr. Futral stated that he had side effects from his medications including grogginess, lightheadedness, and confusion. He stated that he went to sleep about thirty minutes after taking his medication and then slept for four to six hours. He stated that he sometimes had to lie down in bed on his right side to get pain relief, even with his medication. Mr. Futral stated that he does not socialize as much as he did before. He explained that he attempted to start selling insurance but was unable to sit at the computer long enough to complete two to three days of training for the job. He testified that he took Tramadol before the hearing, but not Gabapentin, because Tramadol had a lesser cognitive effect. He stated that he was hurting during the hearing. When asked what would happen if he did not take his medication one day, he replied that he would be unable to get out of bed the next day.

The claimant now seeks reversal of the Commissioner's adverse ruling.

## **Analysis**

### A.    **Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

proper legal standards were used in evaluating the evidence.[31]  Substantial evidence is more than a scintilla but less than a preponderance.[32]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[33]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[34]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but cannot reweigh the evidence or substitute its judgment for that of the Commissioner.[35]  Conflicts in the evidence[36] and credibility assessments[37] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's

---

[31]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[32]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[33]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[34]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[35]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[36]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[37]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

14

subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[38]

## B.    <u>Entitlement to Benefits</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[39]    The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[40]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[41]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such

---

[38]    *Wren v. Sullivan*, 925 F.2d at 126.

[39]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[40]    42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

[41]    42 U.S.C. § 1382c(a)(3)(A).

work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[42]

## C.    <u>Evaluation Process and Burden of Proof</u>

A sequential five-step inquiry is used to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[43]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[44] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[45]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[46]

---

[42]    42 U.S.C. § 1382c(a)(3)(B).

[43]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[44]    20 C.F.R. § 404.1520(a)(4).

[45]    20 C.F.R. § 404.1545(a)(1).

[46]    20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[47]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[48]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[49]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[50]

### D.    The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that Mr. Futral has not engaged in substantial gainful activity since May 13, 2016.  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Mr. Futral has the following severe impairments:  degenerative disc disease of the lumbar spine and cervical spine, cataracts, and obesity, which is supported by substantial evidence in the record.

---

[47]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[48]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[49]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[50]    20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

At step three, the ALJ found that Mr. Futral has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. Mr. Futral did not challenge this finding.

The ALJ found that Mr. Futral has the residual functional capacity to perform light work except for the following: he can occasionally climb ramps or stairs, but should avoid climbing ladders, ropes, or scaffolds; can occasionally balance, kneel, stoop, crouch, and crawl; cannot tolerate exposure to hazards such as unprotected heights or dangerous moving machinery or vibration; and can perform tasks requiring near visual acuity or far visual acuity on an occasional basis. Mr. Futral challenged this finding.

At step four, the ALJ found that Mr. Futral is not capable of performing any past relevant work, and this finding was not challenged.

At step five, the ALJ found that Mr. Futral was not disabled from June 15, 2014 (the alleged disability onset date) through August 24, 2020 (the date of the decision) because there are jobs in the national economy that he can perform. Mr. Futral challenged this finding.

## E.    **The Allegations of Error**

Mr. Futral contends that the ALJ erred (1) in evaluating his credibility; and (2) in failing to give proper weight to the opinions of his treating physician.

**F.    Did the ALJ Err in Evaluating Credibility?**

Mr. Futral argued that the ALJ erred in evaluating his credibility.  An ALJ's assessment of a claimant's credibility is generally accorded great deference.[51]  In fact, the ALJ, as the administrative fact finder, is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly.[52]  The ALJ's "evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence."[53]  The absence of objective factors can justify the conclusion that a witness lacks credibility.[54]  This Court finds that, in this case, the ALJ's credibility determination is supported by substantive evidence in the record.

The ALJ found that Mr. Futral's medically determinable impairments could reasonably be expected to cause his alleged symptoms but further found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence. . . ."[55] According to Mr. Futral's hearing testimony and his function report, his pain limits

---

[51]    *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).

[52]    *Scott v. Heckler*, 770 F.2d at 485.

[53]    *Villa v. Sullivan*, 895 F.2d at 1024.

[54]    *Dominguez v. Astrue*, 286 Fed. App'x 182, 187 (5th Cir. 2008) (citing *Hollis v. Bowen*, 837 F.2d at 1385).

[55]    Rec. Doc. 5-1 at 32.

him to doing little other than sitting in a recliner for a few hours each day while reading, watching television, or playing video games, and lying on his right side in bed when his pain becomes so severe that he can no longer sit upright. But there are no objective findings in the medical records to support this level of impairment.

There are a few oblique references in the record to Mr. Futral's having fallen down a flight of stairs. It is not clear, however, whether that fall caused the alleged neck, back, and left leg pain that he now claims is disabling. There are no medical records from 2014 when the fall allegedly occurred. In May 2016, Dr. Rhodes mentioned having reviewed an MRI, but there are no MRI films or reports in the record. In May 2016, Mr. Futral told Dr. Rhodes he had received a series of three lumbar epidural steroid injections, but there is no evidence of that treatment in the record. In September 2018, Mr. Futral told Dr. Fitch that he had received lumbar epidural steroid injections a year earlier, but there is no evidence in the record documenting any such treatment. Mr. Futral stated at the hearing in 2020 that he was advised by a neurologist that he was not a suitable candidate for surgery, but there are no records from any neurologist or orthopedist in the record. Mr. Futral complained of neck, back, and leg pain to his primary care physician, Dr. Chatman, but not at every visit. More importantly, as will be discussed in greater detail below, there are no objective findings in Dr. Chatman's records supporting the extreme limitations that Mr. Futral claims. Mr. Futral was examined by two consulting

20

physicians, and they both observed that Mr. Futral got up and out of a chair and on and off the examination table without difficulty, ambulated without difficulty and without an assistive device, and had a normal gait. Nothing in Dr. Chatman's records contradicts those findings. Both Dr. Rhodes and Dr. Fitch detected positive straight leg raise tests when testing Mr. Futral's left leg. However, Dr. Fitch, who saw Mr. Futral more recently, opined that he was able to walk and sit continuously in an eight-hour workday. Thus, the ALJ's evaluation of Mr. Futral's credibility is supported by substantial evidence in the record.

## G.    Did the ALJ Err in Weighing the Medical Opinions?

Mr. Futral's primary care physician, Dr. Chatman, submitted an Arthritis Medical Source Statement[56] in which he stated that Mr. Futral had degenerative thoracic, lumbar, and lumbrosacral disc disease with radiculopathy. He stated that Mr. Futral had neck, mid-back, and low back pain that is worse on the left side as well as burning, tingling, and numbness in his left leg and sharp pain in his left heel. Dr. Chatman also stated that Mr. Futral experienced sedation and fatigue due to his medications. He stated that Mr. Futral had a reduced range of motion in his back, neck, and left leg, joint deformity, sensory changes, reflex changes, impaired sleep, impaired appetite, abnormal posture, tenderness, reduced grip strength, muscle

---

[56]    Rec. Doc. 5-1 at 483-486.

spasms, muscle weakness, an abnormal gait, and positive straight leg raising tests. He indicated that depression and anxiety affected Mr. Futral's physical condition. He estimated that Mr. Futral could sit for twenty minutes at a time, could stand for ten minutes at a time, and could sit and stand or walk for less than two hours out of an eight-hour day.  In Dr. Chatman's opinion, Mr. Futral must be allowed to shift positions at will and needs to walk for seven minutes after sitting for fifteen minutes. He opined that Mr. Futral would need to take unscheduled breaks during a workday and would have to rest lying down for half an hour to an hour after working for thirty minutes.  He also stated that Mr. Futral required a cane or other assistive device when standing or walking.  He stated that Mr. Futral could lift less than ten pounds frequently, could never lift more than ten pounds, and had significant limitations with reaching, handling, or fingering.  He stated that Mr. Futral would likely be off task for 25% of a workday and would likely miss more than four days of work each month.

The ALJ found Dr. Chatman's opinions to be "entirely unpersuasive because . . . there is not a single objective functional finding made by Dr. Chatman himself, in any of [the] treatment records to support such an opinion."[57]  Mr. Futral argued, however, that the ALJ should have given Dr. Chatman's opinions greater weight.

---

[57]     Rec.Doc. 5-1 at 35.

Mr. Futral's application for benefits was filed after March 17, 2017. Therefore, the ALJ's duty to weigh medical opinions is governed by 20 C.F.R. 404.1520c.  Although an ALJ is no longer required to give controlling weight to a treating physician's medical opinions, the regulations state that "[w]hen a medical source provides one or more medical opinions. . . , we will consider those medical opinions. . . from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."[58]  The factors to be considered are the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and any other factor which the claimant brings to the court's attention.[59]  The two most important factors are supportability and consistency.[60]  With regard to supportability, the regulation states that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s). . . , the more persuasive the medical opinions. . . will be."[61]  With regard to consistency, the regulation states that "[t]he more consistent a medical opinion(s). . . is with the

---

[58]     20 C.F.R. § 404.1520c(a).

[59]     20 C.F.R. § 404.1520c(c)(1-5).

[60]     20 C.F.R. § 404.1520c(b)(2).

[61]     20 C.F.R. § 404.1520c(c)(1).

evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . will be."[62]  Thus, the regulation requires that Dr. Chatman's medical opinions must be considered together, focusing primarily on the supportability and consistency of his opinions.

Although Dr. Chatman's opinions set forth in the form he filled out indicate that Mr. Futral has significant impairments due to degenerative disc disease in his neck and back, those impairments are not supported by Dr. Chatman's objective findings or consistent with evidence from other sources.  There is no evidence in Dr. Chatman's records that he ever evaluated Mr. Futral's gait, posture, grip strength, range of motion, sensory response, or reflexes.  There is no indication that he ever conducted a straight leg raise test.  There is no indication that he ever took x-rays of Mr. Futral's spine or requested an MRI of Mr. Futral's spine.  There is no indication that Dr. Chatman ever referred Mr. Futral to an orthopedist, neurologist, physical therapist, or pain management specialist.  In some of his treatment notes, there is no mention of pain or degenerative disc disease.

Mr. Futral's primary allegation is back pain.  Pain can constitute a disabling impairment,[63] but pain is disabling only when it is constant, unremitting, and wholly

---

[62]    20 C.F.R. § 404.1520c(c)(2).

[63]    *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).

unresponsive to therapeutic treatment.[64]   Mild or moderate pain is not disabling. Furthermore, subjective complaints, such as complaints of pain, must be corroborated by objective medical evidence.[65]  "The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain will not take precedence over conflicting medical evidence."[66]

In June and July 2017, Mr. Futral told Dr. Chatman that his medications were helping his pain.  Dr. Chatman's treatment note for September 28, 2017 indicates that Mr. Futral's left leg pain was being controlled with medication.  On December 19, 2017, Mr. Futral complained about his right vision getting worse, but he had no other concerns or complaints.   At four successive appointments in 2019, Dr. Chatman's treatment notes indicated that Mr. Futral was "doing OK."  Thus, Dr. Chatman's records support a conclusion that Mr. Futral's pain was not intractable or disabling.   This conclusion is consistent with Mr. Futral telling Dr. Fitch in September 2018 that his pain level was 5 out of 10.

Dr. Chatman's treatment notes support the conclusion that Mr. Futral was diagnosed with degenerative disc disease.  But the mere diagnosis of a disease or condition does not establish the extent to which a person is functionally impaired.

---

[64]     *Falco v. Shalala,* 27 F.3d at 163; *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990).

[65]     *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

[66]     *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).

More important, a physician's opinions regarding a patient's level of functional impairment must be supported by objective clinical findings.  In this case, there is no evidence of such findings to support Dr. Chatman's opinions.

Similarly, when Dr. Chatman diagnosed Mr. Futral with adjustment disorder with mixed anxiety and depressed mood on November 7, 2018, there were no objective clinical findings in the treatment note backing up that diagnosis.

The opinions set forth in Dr. Chatman's medical source statement are not supported by objective medical evidence nor are they consistent with other medical sources.  Therefore, the ALJ did not err in failing to give more weight to Dr. Chatman's opinions.  The claimant has the burden of proving that he is disabled.  In this case, Mr. Futral failed to carry that burden.

## Conclusion and Recommendation

For the reasons fully discussed above, this Court recommends that the Commissioner's decision should be AFFIRMED, and this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[67]

Signed in Lafayette, Louisiana, this 2nd day of December 2021.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[67]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).